### No. 25,329.

### G. H. HILL and H. H. HAYES, as Administrators, etc., *Appellants,* v. WILLIAM PETTY et al., *Appellees.*

#### SYLLABUS BY THE COURT.

1. MORTGAGE—*Note Not Signed by Wife—Plaintiff's Right to Foreclose Mortgage—Judgment in Rem.* In an action by administrators of an estate to recover on a note and to foreclose a mortgage given to secure its payment the record examined, and *held,* that one who joins in the execution of a real-estate mortgage as security for a note cannot defeat foreclosure merely because she did not also sign the note; and *held also,* that the jury's special findings were not a sufficient basis for a denial of foreclosure to satisfy a judgment *in rem,* although the special findings would be sufficient to defeat a judgment *in personam.*

2. SAME—*Errors Justified Granting of New Trial.* Errors assigned on incompetent testimony, instructions and on evidence adduced in support of motion for a new trial considered, and a new trial ordered thereon.

Appeal from Franklin district court; HUGH MEANS, judge. Opinion filed June 7, 1924. Reversed.

*F. M. Harris,* and *F. A. Waddle,* both of Ottawa, for the appellants.
*H. M. Funston,* of Ottawa, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiffs, as administrators of the estate of C. W. Goodin, late of Franklin county, brought this action against defendants, William Petty and Bridget Petty, his wife, to recover judgment on a note for $3,600, which purported to have been executed by them, and to foreclose a mortgage on forty acres of land apparently given as security therefor. The note was payable

Hill, *Adm'r*, v. Petty.

to Goodin or order, dated March 5, 1917, due in five years, and the mortgage pertaining thereto recited a notarial acknowledgment before A. C. Maxson, jr., notary public, and it was filed for record on March 9, 1917, and duly recorded by the register of deeds.

The principal defense was that Bridget Petty neither signed the note nor the mortgage, and that the land covered by the mortgage was the family homestead of defendants.

The cause was tried before a jury, which made special findings of fact, and returned a verdict for plaintiffs against William Petty alone. The special findings, in part, read:

"First. Did the defendants acknowledge the mortgage in question before A. C. Maxson, notary public, as certified to by him? Answer. No. . . .

"Third. Did the defendants make any objection to said note and mortgage until after suit was filed thereon? Answer. Yes.

"Fourth. Did the defendants William Petty and Bridget Petty sign jointly and deliver the mortgage in question in this action? Answer. No."

Foreclosure of the mortgage to satisfy the judgment was denied, and plaintiffs' motion for a new trial was overruled. They appeal, assigning various errors, chief of which relate to the admission of incompetent evidence, fallacious instructions, and perjury of defendants.

Touching these in order, plaintiffs urge that defendants repeatedly indulged in the violation of the statutory and salutary rule which forbids a litigant to testify in his own behalf to any transaction or communication had by him personally with a deceased person where the adverse party is the administrator. (R. S. 60-2804.) Thus William Petty testified that he signed his wife's name to the note, and that he did it at Goodin's request, but the record is not clear that the trial court overruled any of plaintiffs' objections to this sort of testimony; and, indeed, part of this testimony was elicited, or at least amplified, in response to questions propounded on cross-examination. The record reads:

"*Direct examination of William Petty, witness for defendants.*

"Q. Did you owe Charles Goodin on that note, March 5, 1917, $3,600? A. I did not. . . .

"Q. That's your signature, isn't it? A. Yes, sir.

"Q. Yes; now I find on that note the name of 'Bridget Petty.' Did you sign that too? You signed that one too, didn't you?

"Objected to . . . as incompetent, irrelevant and immaterial.

"A. Yes, sir.

"[Counsel for plaintiff:] And calling for a transaction with a deceased person.

"The Court: Overruled. Try it again at the beginning. . . .

"Q. You say you signed it? A. Yes, sir, at Charlie Goodin's request. . . ."

*"Cross-examination.*

"Q. Mr. Petty, are you in the habit of forging other people's names to paper? A. No, not everybody's. . . .

"A. Well, I did this . . . at Mr. Goodin's request, and I owed him a little and couldn't pay it, and he threatened me with the law. He said, 'Here is the law, and I will put a judgment on your place.' 'Well,' I said, 'my wife won't sign the mortgage.' 'Well,' he said, 'You can sign for her,' and I signed up the note and mortgage with him, and he said, 'This will be all right. Here, now I will—' . . .

"Q. How does it come, Mr. Petty, that you wrote 'Bridget Petty' better than you wrote 'William Petty'? A. I had an expert to help me do it.

"Q. You undertake to tell this jury that you wrote your name there with somewhat of a scrubby signature, and then wrote here with better writing, do you? A. Yes, sir. I had a man to guide the pen for me. Yes, sir, Mr. Goodin done it. . . ."

*"Redirect examination.*

"Q. I want to know whether you were in the habit of signing your wife's name to any note without her consent. A. I think one or two; I don't know how many.

"Q. But in this case you informed the party [Goodin] that you had no right to sign it? A. Yes, sir; I did."

Bridget Petty also gave incompetent testimony apparently designed to show that during the lifetime of Goodin she had objected to the mortgage on her property.

"I got a notice from Mr. Goodin; I don't recall the date. . . . I . . . went to see Mr. Goodin . . .

"Q. I will ask this question, Mrs. Petty. This note is dated March 5, 1917. Were you in Ottawa on that day? A. I was not.

"Q. And were you present at the time that this note was signed? A. I was not."

"[Counsel for plaintiff:] I object to that as incompetent, irrelevant and immaterial, a transaction with the deceased.

"The Court: Objection overruled. . . ."

*"Redirect examination.*

"Q. I believe you said now, to get this matter straight, that you first received notice about this mortgage, the first intimation you ever had of it, some time after it was made, in relation to the payment of some interest. Is that right? A. Yes, I think—

"Q. This is when you came to see Mr. Goodin? A. Yes, sir."

This testimony was incompetent under the rule cited above, and it is difficult to say that it did not prejudicially affect the result. Passing that for the present, however, let us look at plaintiffs'

complaint at the instructions. Aside from the object of getting a personal judgment against the husband and wife on the $3,600 note, this was not necessarily a jury case; it was not a jury case so far as concerned the foreclosure of the mortgage, and consequently an instruction, though erroneous, would not necessarily be prejudicial. But it might be significant as indicating whether the trial court's erroneous conception of the law had not led it into an erroneous and unjust judgment. Among the instructions complained of are the following:

"As to the defendant Bridget Petty, if you find that she signed the note, or that some one authorized by her signed it, then in that event your verdict should also include her. If you don't find that she signed the note, then in that event your verdict should not be against her. . . .

"As to the mortgage, if both Mr. and Mrs. Petty signed the mortgage, of course it would be behind this note as security. It's a matter that you don't deal with directly, but you may take into consideration the evidence with reference to the mortgage in passing upon the question of whether or not both these parties signed this note. Of course if they didn't sign the note the mortgage isn't of any value, because there isn't any action the court could take to foreclose a mortgage that isn't given to secure a debt, and as I say, you are not directly concerned with the mortgage except as to its evidentiary value before you."

The first of these is substantially correct. A personal judgment could not be entered against Bridget unless she signed the note. In this case, however, a mere personal judgment against either or both defendants is conceded to be worthless. Unless the mortgage is foreclosed to satisfy it, the plaintiffs' judgment against Petty will be altogether fruitless. And whether Bridget incurred any personal liability on the note by signing or authorizing the signing of her name thereto or not, she could bind the property to the satisfaction of William's note. If she signed the mortgage, but not the note, the mortgage could be enforced to the satisfaction of the debt secured by it, although no personal judgment could be entered against her. And this question of fact was squarely addressed to the judgment and conscience of the trial court, regardless of how the jury in their caprice, prejudice or insincerity may have dealt with it. Complaint is also made of this instruction:

"The acknowledgment and certification by a notary on an instrument of this kind is *prima facie* evidence of its execution in due form; that the parties signing the instrument appeared before him and acknowledged the execution of it. That proof, as I say, makes a *prima facie* case. That may be overcome, however, by the evidence of the defendant in this case, and if you

believe from all the evidence that Mrs. Petty was not at Maxson's office, or Goodin's office at the time of the execution of the alleged mortgage, that she didn't acknowledge it to him, then in that event no rights can accrue to the plaintiff in this case by reason of the mortgage."

This instruction is subject to the criticism that it states and concretely applies a rule which would permit signatures and acknowledgments of instruments to be too lightly swept away, and it takes no cognizance of the highly significant fact that this particular mortgage bearing Bridget's signature had been of record for over five years before she ever took any effective steps towards its nullification. Moreover, as between the original parties and their legal representatives, with no rights of third parties concerned, Bridget's signature to the mortgage would make it perfectly good if it had never been acknowledged at all.

The next error urged pertains to the overruling of the motion for a new trial, and it is argued that the evidence presented in its support demonstrated that Bridget committed perjury in a material matter which must have affected the general result. She had testified that the homestead had never been mortgaged:

"Q. You had another mortgage on your farm before this didn't you? A. Did not.

"Q. Did not? Wasn't there a mortgage on that before this time? A. We never had no mortgage on it. It was clear."

But it was shown by the mortgage records of the county that Bridget Petty and her husband had mortgaged this property for $1,800 on November 2, 1906, to the deceased, Goodin; released March 2, 1909. Another mortgage by Bridget and her husband for $2,400 was given to Goodin March 16, 1909, and released March 2, 1914. Another mortgage was given by Bridget and her husband for $3,000 to Goodin's aunt on March 5, 1914, and released on March 9, 1917, which was the date of the mortgage involved herein. Other testimony too long for repetition here was to the same general effect.

In view of all the foregoing, so far as a miscarriage of justice can be demonstrated by a printed record, an erroneous result is established in this appeal. The trial court apparently relied too much on the jury's special findings, which so far as concerns the foreclosure of the mortgage were advisory only. And when in addition to the evidence disclosed by the mortgage records, it is also considered that William Petty could scarcely write legibly and

could not spell his own name and could not possibly have written Bridget's as it appears in the photographic reproduction in the record, and when a comparison between Bridget's admitted signatures and that appearing on the mortgage (as well as on the note) discloses so plainly that it is the work of the same hand as to reduce a denial of their common authorship to nothing less than trifling with the court, this court is bound to hold that a palpable frustration of justice has been effected which imperatively requires that the judgment be reversed and a new trial ordered.

Reversed.